**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**SHEILA INGRAM,**

      **Plaintiff,**

**v.**                                        **Case No.: 3:08cv113/MCR/MD**

**AETNA LIFE INSURANCE COMPANY,**

      **Defendant.**

_____/

# O R D E R

The Plaintiff, Sheila Ingram, brings this action against the Defendant, Aetna Life Insurance Company ("Aetna"), pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), to recover under a long-term disability ("LTD") plan ("the Plan") sponsored by her employer, Gannett Co., Inc. ("Gannett"). (A.R. GAN 00003). The plaintiff filed a claim for LTD benefits on February 20, 2006, alleging that she became totally disabled as a result of a mental illness and stopped working on September 7, 2005. (A.R. GAN 00193).[1] The initial plan administrator, Prudential Life Insurance Company ("Prudential"), denied the plaintiff's claim and first appeal. Aetna, which took over administration of the Plan before a final decision was made on the plaintiff's claim, upheld Prudential's denial.[2] The plaintiff then filed this action (doc. 1) on March 17, 2008. Pending before the court are cross-motions for summary judgment (docs. 53, 57). The court, having fully considered the administrative record and the parties' arguments, concludes defendant's motion should be granted and plaintiff's motion should be denied.

---

[1] Documents in the administrative record will be referred to by "A.R.," followed by the Bates stamp number on the bottom of the page, *e.g.*, "(A.R. GAN 00001)."

[2] According to the Amended Complaint (doc. 29), Aetna took over administration of the Plan on December 1, 2006.

## FINDINGS OF FACT

Gannett is an international news and information company.  The plaintiff was employed by Gannett as a reporter for the Pensacola News Journal ("News Journal") from June 23, 1983, to September 6, 2005.  (A.R. GAN 00193).   As a benefit of her employment, the plaintiff was eligible for and participated in a long-term disability ("LTD") under which

> [d]isability exists when, due to a medically determinable sickness or accidental injury, all of the following conditions are met: (a) the person is unable to perform the material and substantial duties of his or her occupation for two years and unable thereafter to perform the material and substantial duties of any job for which the person is reasonably fitted considering education, training and experience; (b) the person is not working at any job for wage or profit . . .; and (c) the person is under the regular care of a physician.[3]

(A.R. GAN 00003-4).  "Disability resulting from mental illness" is specifically included in coverage under the Plan. (A.R. GAN 00004).  LTD benefits are paid to eligible employees after twenty-six continuous weeks of disablement and, in the case of disability due to mental illness, for twenty-four months.  (A.R. GAN 00003-4).  The plaintiff claims that, on September 7, 2005, she became disabled by post-traumatic stress disorder ("PTSD") and major depression.[4]  More particularly, the plaintiff claims that her PTSD and depression, from which she suffered for years, were exacerbated by the onslaught of hurricanes in the area, beginning with Hurricane Ivan in 2004 and culminating with Hurricane Katrina in 2005, rendering her unable to perform the material and substantial duties of her occupation.   The plaintiff began receiving short term disability ("STD") benefits on September 14, 2005, and became eligible for LTD benefits on March 8, 2006.  (A.R. GAN 00118, 193).  In order to begin receiving LTD benefits on her date of eligibility, the plaintiff had to be continuously disabled during the previous twenty-six week period, or from

---

[3]  The parties dispute only whether the plaintiff was unable to perform the material and substantial duties of her occupation.

[4]  The plaintiff was almost fifty-two years old at the time.

September 7, 2005, to March 8, 2006.[5]  (A.R. GAN 00004).  Aetna found insufficient evidence that the plaintiff was unable to perform the material and substantial duties of her occupation during the elimination period and denied her claim for LTD benefits.

## A.     Plaintiff's Medical History

In support of her claim for LTD benefits, the plaintiff claims to have been under the care of at least five therapists over a period of several decades and to have taken a number of medications for anxiety and depression.  (A.R. GAN 00100, 00196).  The plaintiff identified as treating physicians a psychologist, Tina P. Beissinger, who she began seeing in 2001, and a psychiatrist, Michael P. Conrad, who she began seeing in 2003.[6] (A.R. GAN 00190).  Although the plaintiff claims to have begun seeing Dr. Beissinger in 2001, she submitted records from Dr. Beissinger dating back to only October 13, 2005. Those records show that Dr. Beissinger had 50-minute therapy sessions with the plaintiff approximately once every two weeks, which she documented on a progress form containing a section for DSM-IV diagnoses, current medication, mood symptoms (calm, sad, anxious, elated, agitated, other), affect (appropriate, flat, labile, blunted, other), thought process (logical/coherent, loose association, circumstantial, tangential, rambling/flight of ideas), thought content (unremarkable, delusions, hallucinations, phobia/fears, obsessive ideas, worthlessness, helplessness, somatic complaints, paranoid, religiosity, guilt, disorganized, other), sleep problems (denies, frequent awakening, early awakening, initial insomnia, hypersomnia, sleepwalking, nightmares, other), appetite problems (denies, increase, decrease, overeating, undereating, purging/vomiting, binging, other), suicidal ideation (none reported, thoughts, plan, means, intent), homicidal/violence ideation (none reported, thoughts, plan, means, intent), response to intervention (open/cooperative, guarded, aggressive/hostile, oppositional/uncooperative,

---

[5]  The twenty-six week period is referred to in the Plan as the "elimination period."

[6]  According to the plaintiff, after moving to Pensacola, she received psychotherapy from Dr. Norbert Johnson, who is now deceased, and briefly from Dr. Lewis Davidson.  (A.R. GAN 001010).  She also was prescribed various anti-depressant medications by her family practitioner, Dr. Laura Harrison, who ultimately referred her to Dr. Conrad for stabilization of her medication.  (A.R. GAN 00100, 00308).

anxious/hyperactive, other), progress in treatment (no change, regression, minimal, good, excellent), homework/reminders, and issues and intervention attempted.

On October 13, 2005, Dr. Beissinger noted that the plaintiff had been diagnosed with PTSD and that she was "overwrought associated [with] newsroom since Oct[ober] 2004." (A.R. GAN 00217). The plaintiff's mood was calm, however, and her affect was appropriate, but she was tearful. (A.R. GAN 00217). Dr. Beissinger recorded the plaintiff's thought process as logical and coherent and her thought content as unremarkable, other than the fact that she had fears regarding family issues. (A.R. GAN 00217). The plaintiff denied having sleep problems, but indicated that she was having nightmares, apparently associated with her PTSD.[7] (A.R. GAN 00217). The plaintiff also denied having appetite problems and mentioned that she intended to start walking. (A.R. GAN 00217). The plaintiff had no suicidal or homicidal/violent ideation, was open/cooperative in response to intervention, and was progressing well in her treatment.[8] (A.R. GAN 00217). The plaintiff discussed with Dr. Beissinger matters pertaining to her dreams and ill feelings toward her mother; indicated that she was learning what to do about her time, presumably because she was no longer working; and commented that she wants to be happy when she dies. (A.R. GAN 00217). When the plaintiff saw Dr. Beissinger on October 26, 2005, she was still having nightmares regarding the 1973 tornado and was sad and anxious as a result. (A.R. GAN 00218). Although she reported fears, she was having no sleep or appetite problems and was still progressing well in her treatment. (A.R. GAN 00218). In addition to her nightmares, the plaintiff discussed with Dr. Beissinger her visit downtown near the News Journal building which purportedly evoked painful memories for her. (A.R. GAN

---

[7] As discussed below, the plaintiff attributes her PTSD and depression to a number of factors, including a dysfunctional family; a tornado that destroyed her hometown in 1973, when she was nineteen years old and entering her sophomore year in college, and killed a man who had sought refuge a few feet from her; and years of childhood sexual abuse by her uncle. Although the plaintiff stated in her letter of appeal that she does not share private details of her life with many people, she published a story in the News Journal about the sexual abuse. (A.R. GAN 00101)

[8] On October 13, 2005, as well as each session thereafter, the plaintiff's thought process was logical/coherent and she had no suicidal or homicidal/violence ideation. Moreover, unless otherwise indicated, the plaintiff's affect was appropriate, her thought content was unremarkable, and she was open/cooperative in response to intervention.

00218).

The first record of plaintiff's sessions with Dr. Conrad is on November 7, 2005, when she had a twenty-minute session for follow-up of her major depressive disorder.[9] (A.R. GAN 00219). According to the medical records, the plaintiff had a twenty-minute session with Dr. Conrad approximately once every six weeks, although the intervals fluctuated from once a month to once every two or three months. Like Dr. Beissinger, Dr. Conrad prepared progress notes in connection with his sessions with the plaintiff, which document a reason for the visit, which was always either follow-up of her major depressive disorder or follow-up of her major depressive disorder and PTSD; a subjective/objective component, in which Dr. Conrad recorded the issues discussed; an assessment of the plaintiff, which consisted of her diagnoses; and a plan, which pertained to the plaintiff's medication. The plaintiff reported to Dr. Conrad on November 7, 2005, that she had been on medical leave from work for the past two months and that she could remain on medical leave for up to six months. (A.R. GAN 00219). According to Dr. Conrad's notes, the plaintiff explained that "Hurricane Katrina pretty much caused her to just not be able to be functional at work. She started having some PTSD symptoms relating back to the tornado that hit when she was a young girl in Alabama. It just felt overwhelming and she could not continue on." (A.R. GAN 00219). Dr. Conrad maintained the plaintiff's current medications, which included Trazodone, Xanax, and Effexor. (A.R. GAN 00219). Two days after her visit with Dr. Conrad, the plaintiff again saw Dr. Beissinger. (A.R. GAN 00220). She was calm, reported that her sleep had improved and that she was having no problems with her appetite, and was progressing well in her treatment. (A.R. GAN 00220). The plaintiff mentioned to Dr. Beissinger that she had joined a gym, which Dr. Beissinger considered a very positive step, and discussed issues pertaining to her mother and husband. (A.R. GAN 00220). The plaintiff also commented that she had worked at the News Journals for twenty-four years. (A.R. GAN 00220). The plaintiff's condition remained essentially the

---

[9] Based on the record, it appears that the plaintiff consulted Dr. Beissinger primarily for counseling and Dr. Conrad primarily for medication. Although they do not work in the same office, Dr. Beissinger and Dr. Conrad have offices in the same building. (A.R. GAN 00188).

same on November 29, 2005, when she again discussed matters pertaining to her husband and her husband's family, as well as the fact that she had joined a gym and had low expectations in that regard. (A.R. GAN 00221).

During the six-month period the plaintiff received STD benefits, Dr. Beissinger submitted Short Term Disability Updates ("Updates") on her behalf on forms provided by the News Journal. Among other things, the form requested information pertaining to the plaintiff's progress and prognosis, including whether the plaintiff was "totally disabled from performing duties as outlined in the attached job description" and, if so, the specific duties restricted, as well as her capability of performing modified duties. (A.R. GAN 00222). In the first Update, submitted on December 9, 2005, Dr. Beissinger stated there had been no change in the plaintiff's condition, but failed to indicate whether the plaintiff was totally disabled from performing the duties of her occupation, citing the absence of an attached job description. (A.R. GAN 00222). In describing the plaintiff's restrictions, Dr. Beissinger stated that the plaintiff was unable to cope with the stressors of her work environment associated with her assignments and post-Ivan PTSD and incapable of performing modified duties. (A.R. GAN 00222-23). According to Dr. Beissinger, the plaintiff's status at the time rendered her unable to function adequately in a high stress environment, as she was easily overwhelmed when feelings of safety and trust were threatened; the plaintiff also had difficulty interacting with others. (A.R. GAN 00223). Dr. Beissinger noted that the plaintiff had been diagnosed with PTSD, depression, and anxiety and that she suffered from attacks, nightmares, and flashbacks, for which she was taking mediation and working with a physician. (A.R. GAN 00223). Finally, Dr. Beissinger indicated that she expected the plaintiff to remain disabled for at least six months, but hoped the plaintiff would improve. (A.R. GAN 00223).

The plaintiff next saw Dr. Beissinger on December 12, 2005, at which time she was calm, but sad and angry about a number of things, including her life, Pensacola, and what appears to be sexual issues.[10] (A.R. GAN 00224). The plaintiff reported fears about

---

[10] Dr. Beissinger's notes are illegible at times. Also, the copies contained in the record are incomplete in certain instances in which it appears that portions were cut off during copying.

money and her future, as well as hopelessness, but was having no sleep or appetite problems and was making excellent progress in her treatment. (A.R. GAN 00224). Dr. Beissinger suggested that the plaintiff associate with others and noted that she was getting better at doing that as time went on, but that the plaintiff expected rejection and ridicule and subsequently withdrew. (A.R. GAN 00224). The plaintiff mentioned that her husband wanted to convince Dr. Beissinger that she could not work and was annoyed that Dr. Beissinger did not appreciate the extent of her impairment, including that there were certain mundane things she could no longer do. (A.R. GAN 00224). The plaintiff was concerned about her husband's anger. (A.R. GAN 00224). Dr. Beissinger noted the plaintiff continued to try stress reduction activities and that she was exercising almost daily. (A.R. GAN 00224). When the plaintiff saw Dr. Conrad the next day, she reported that things had been going much better for her since she started exercising, but that she still was not working and was going to try to "work out the details of that with Human Resources and bring by a policy so that we can understand what is required at this point." (A.R. GAN 00225). According to Dr. Conrad's notes, the plaintiff did not intend to return to work and, instead, was "going to try to change her life at this point," the details of which she was working on with Dr. Beissinger. (A.R. GAN 00225). Dr. Conrad continued the plaintiff's medications, noting that they seemed to be effective for her. (A.R. GAN 00225). The plaintiff saw Dr. Beissinger again a little more than two weeks later, at which time she appeared sad and angry and presented with unremarkable, but disorganized, thought content, including phobias regarding a hostile work environment. (A.R. GAN 00226). The plaintiff reported no sleep or appetite problems and that she was exercising regularly; Dr. Beissinger also noted that the plaintiff was progressing well in her treatment despite a difficult visit to her hometown over the holidays. The plaintiff explained to Dr. Beissinger that she was very frustrated with her mother and discontent with her husband's scruffy appearance. (A.R. GAN 00226). The plaintiff also mentioned that she was having "some residual symptoms of PTSD," but there was no indication what those symptoms were or how they impacted the plaintiff. (A.R. GAN 00226).

The plaintiff next saw Dr. Beissinger on January 9, 2006, when she again was sad and anxious over an issue at work.[11]    Although she had an appropriate affect, she was tearful when talking about flashbacks, Hurricane Ivan, her fear of going downtown, and the tornado that destroyed her hometown. (A.R. GAN 00227).  The plaintiff expressed fears, feelings of helplessness, and survivor guilt, but indicated that she had no sleep or appetite problems and was exercising daily.  According to Dr. Beissinger, the plaintiff had made minimal progress in treatment since her last visit. (A.R. GAN 00227).  Dr. Beissinger submitted another Update on January 19, 2006, in which she indicated that the plaintiff's progress was unchanged, but that the plaintiff was not totally disabled from performing the duties of her job, as outlined in her job description.[12]  (A.R. GAN 00228).  Dr. Beissinger explained, however, that the plaintiff reported a reappearance of symptoms of PTSD, including anxiety, flashbacks, and nightmares, when thinking of her work environment and upon overexposure to stressors reminding her of former traumatic events and opined that the plaintiff was "unlikely to return to pre morbid level of functioning." (A.R. GAN 00229). Dr. Beissinger further stated that the plaintiff's status at the time rendered her unable to return to "location and duties associated [with her] work environment" because she was prone to anxiety attacks, impaired concentration, light or flight response, nausea, and being easily overwhelmed when feelings of safety or predictability were threatened. (A.R. GAN 00229).  When the plaintiff presented to Dr. Beissinger five days  later, on January 24, 2006, she was calm. (A.R. GAN 00230).  Dr. Beissinger noted that there had been no change in the plaintiff's diagnoses, but that her symptoms were being addressed with medication and that she was having no sleep or appetite problems, was going to the gym

---

[11]  The court is unable to decipher Dr. Beissinger's handwriting further.

[12]  According to the plaintiff's job description, she was required to plan, research, and write news and feature stories with minimal supervision.  Her duties included acting as a mentor for beginning reporters; setting an example/standard for other reporters; assisting in the running of sections when necessary; independently evaluating and selecting stories; suggesting and developing projects or stories; researching, reporting, and writing; cultivating sources; developing beats; assigning photos and graphics to stories; preparing daily and long-range budgets; interacting and familiarizing herself with the community; practicing and encouraging good customer service; and reading the Pensacola News Journal on a daily basis. (A.R. GAN 00107-10).

on a regular basis, had lost some weight, and was making good progress in her treatment. (A.R. GAN 00230). The plaintiff reported that a hot stone massage had helped, but that she felt useless and bleak and was unable at the time to go into the downtown area due to panic attacks, shortness of breath, anxiety, clamminess, increased heart rate, and sweaty palms.[13] (A.R. GAN 00230).

When she saw Dr. Conrad on February 2, 2006, the plaintiff stated that being away from work had been extremely helpful, but she noted that her leave would be up at the beginning of March and that she was still trying to determine what she was going to do in that regard and intended to look at other options, including working with animals. (A.R. GAN 00231). As usual, Dr. Conrad continued the plaintiff on her same medications. (A.R. GAN 00231). The plaintiff was once again calm and presented with an unremarkable thought process, other than fears, when she saw Dr. Beissinger on February 14, 2006. (A.R. GAN 00232). She was not having any sleep or appetite problems and was progressing well in her treatment. (A.R. GAN 00232). The plaintiff discussed her relationship with her husband and the fact that their communications had improved. (A.R. GAN 00232). Dr. Beissinger indicated that it was time for the plaintiff to develop a self use support system. (A.R. GAN 00232). Dr. Beissinger submitted an Update the same day in which she reiterated that the plaintiff was not totally disabled from performing the duties of her job. (A.R. GAN 00237). Dr. Beissinger again explained, however, that the plaintiff continued to report significant anxiety and flashbacks and that her symptoms increased when she thought of returning to certain physical locations associated with her job, causing her to actively avoid those areas. (A.R. GAN 00238). Dr. Beissinger opined that the plaintiff's "current status emotionally cause[d] impaired function in specific situations which act as a trigger for memory of traumatic events, especially when sense of safety is

---

[13] Although the plaintiff repeatedly complained of fear and PTSD symptoms when going to downtown Pensacola near the News Journal building, it appears that her avoidance of downtown Pensacola began after she took leave from her job and stemmed from shame she felt as a result of having left her job rather than the hurricane. Indeed, in her letter of appeal, the plaintiff explained that she avoided going downtown because she did not want to "see people that [she] dealt with daily as a reporter – partly because of shame, and party because of fear." (A.R. GAN 00100).

threatened." (A.R. GAN 00238). When the plaintiff saw Dr. Beissinger two weeks later, she was calm, sad, and anxious and was having fears and thoughts of worthlessness, helplessness, and guilt over issues pertaining to her mother.[14] (A.R. GAN 00239). Dr. Beissinger noted that the plaintiff was taking Lunestra for sleep disturbance, including bad dreams, and had lost weight, which apparently was a positive thing for her. (A.R. GAN 00239). The plaintiff reported a feeling of general anxiety on a daily basis, along with impaired concentration and fatigue and had made only fair progress in her treatment since her last session. (A.R. GAN 00239). The plaintiff also reported that she was receiving support from her husband, but that he was afraid of her being in high stress environments. (A.R. GAN 00239). In another Update submitted that day, Dr. Beissinger indicated for the first time that the plaintiff was disabled – "at this time."[15] (A.R. GAN 00240). Dr. Beissinger opined that the plaintiff was "unable to function or complete duties in work environment [without] severe panic disorder [and] anxiety" and stated that the plaintiff was limited by a psychological impairment regarding exposure to stressors associated [with] job duties - flashbacks, unwanted thoughts, panic attacks."[16] (A.R. GAN 00240).

The plaintiff saw Dr. Conrad on March 15, 2006, and reported that everything had been going okay for her. (A.R. GAN 00243). She told Dr. Conrad that she was still trying to resolve issues with work – leaving the situation and moving forward – but that she had not yet decided what she was going to do. (A.R. GAN 00243). The plaintiff reported that her husband was having increased episodes of rage and had recently been prescribed Zoloft, as a result of which he seemed to be improving. (A.R. GAN 00243). Dr. Conrad continued the plaintiff on her current medications and stated that he would see her again in a month or two. (A.R. GAN 00243). The plaintiff also saw Dr. Beissinger in March 2006,

---

[14] The plaintiff expressed feelings of guilt and shame over the fact that her mother had made sacrifices for her, including working in a factory to ensure that she could provide for the plaintiff.

[15] The twenty-six week elimination period was to expire a little more than a week afer the February 28, 2006, Update.

[16] The February 28, 2006, Update was submitted almost six months after the plaintiff took leave from her job, and there is no indication in the record that the plaintiff suffered from such impairments while actually working at the News Journal.

although the precise date is not clear.[17] (A.R. GAN 00247). The plaintiff was sad and angry with a nearly flat affect when she saw Dr. Beissinger and reported feeling overwhelmed by demands of her house, surgery, and disability claim.[18] (A.R. GAN 00247). The plaintiff's thought content was unremarkable, other than fears and feelings of helplessness, but she had difficulty sleeping – with early awakening, initial insomnia, and nightmares – and a decreased appetite with weight loss. (A.R. GAN 00247). Dr. Beissinger noted that the plaintiff was progressing only fairly in her treatment and had extremely strong responses of anxiety and depression associated with the news and work events, was having difficulty relaxing, and was anxious most of the time. (A.R. GAN 00247). The plaintiff informed Dr. Beissinger that she could not handle her former work or work environment and reported being overwhelmed by attitudes in the work environment and uncaring responses to her level of distress and anxiety. (A.R. GAN 00247). Dr. Beissinger instructed the plaintiff to make a list of things she enjoyed. (A.R. GAN 00247).

When the plaintiff saw Dr. Beissinger on April 18, 2006, she was sick and reported that an MRI had revealed deterioration in the cartilage under her knee cap. (A.R. GAN 00249). Although Dr. Beissinger's notes are rather cryptic, it appears the plaintiff discussed matters pertaining to the News Journal and Prudential, presumably her disability claim. (A.R. GAN 00249). The plaintiff also discussed issues pertaining to her mother, including that she was controlling, negative, judgmental, nasty, and used abusive language. (A.R. GAN 00249). The plaintiff again mentioned the fact that her husband had been prescribed Zoloft and was experiencing sexual side effects. (A.R. GAN 00249). When the plaintiff saw Dr. Conrad on April 24, 2006, her claim for LTD benefits had been denied. (A.R. GAN 00250). The plaintiff conveyed to Dr. Conrad the reasons for the denial, which he opined were inaccurate because of the plaintiff's continued PTSD symptoms. (A.R. GAN 00250). According to Dr. Conrad, while being away from work caused an improvement in the plaintiff's symptoms, she still suffered from nightmares,

---

[17] The date on Dr. Beissinger's report is March 58, 2006.

[18] The record is not clear on the nature of the plaintiff's surgery or whether it was performed.

startled responses, and increased sympathetic outflow.  (A.R. GAN 00250).  Dr. Conrad
noted that the plaintiff's depression had improved with medication, but opined that it would
still be very difficult for her to work, a matter she was addressing with Dr. Beissinger.  (A.R.
GAN 00250).  Because the plaintiff was having difficulty sleeping, Dr. Conrad prescribed
her Klonopin instead of Xanax; her medications otherwise remained the same.  (A.R. GAN
00250).

The next time the plaintiff saw Dr. Conrad, on May 31, 2006, she reported that
things were going okay for her and that she had been doing some yard work and enjoying
sitting outside with her husband.  (A.R. GAN 00252).  The plaintiff admitted to drinking up
to six glasses of wine a day, but indicated that she was going to try to cut back on her
drinking and eventually quit.  (A.R. GAN 00252).  The plaintiff had appealed the denial of
her disability claim and informed Dr. Conrad that she had not heard anything in that regard,
but was hoping to help her husband with his golf publications.  Dr. Conrad continued the
plaintiff on her current medications and stated that he would see her again in two months.
(A.R. GAN 00252).  The plaintiff's next visit with Dr. Beissinger was on June 20, 2006.
Once again, Dr. Beissinger's notes are difficult to decipher, but it appears the plaintiff
reported that Zoloft was causing her fatigue and also that she became easily exhausted
from heat.  (A.R. GAN 00253).  The plaintiff reported experiencing nightmares four times
in one week, including one in which she was fired from the News Journal due to budget
cuts; one regarding flying on an airplane and a rattlesnake in her meal during her flight;
another in which she attended a family function, observed her cousins to be more
glamorous than she, and felt disapproval and a lack of acceptance; and another
concerning tornadoes.  (A.R. GAN 00253).  The plaintiff discussed her disability claim and
the need for a written appeal and also informed Dr. Beissinger that a reporter from the
News Journal was going to law school and that five other reporters were leaving or had
already left due to issues with management.  (A.R. GAN 00254).

During a July 15, 2006, session, Dr. Beissinger noted that the plaintiff had improved
as a result of her medication, which alleviated some of her symptoms.  (A.R. GAN 00255).
The plaintiff was calm and reported improvement in her sleep, but still had fears and a

decreased appetite. (A.R. GAN 00255). The plaintiff was nevertheless progressing well in her treatment, and Dr. Beissinger stated that the fluctuation in the plaintiff's progress appeared to be associated with exposure to stressors. (A.R. GAN 00255). The plaintiff reported to Dr. Beissinger that she and her husband were spending better quality time together and that she felt a greater sense of family having her step-daughter and grandchildren next door to her. (A.R. GAN 00255). Dr. Beissinger again commented on the effectiveness of the plaintiff's medication on July 24, 2006, but noted that the plaintiff was sad and anxious about an endoscopy and fearful of her future. (A.R. GAN 00256). The plaintiff reported that she had decreased her alcohol consumption, was sleeping better and had less fatigue, that her appetite had decreased, and that she was taking better care of herself. (A.R. GAN 00256). The plaintiff was looking forward to the upcoming softball season and reported surprise in finding herself laughing out loud for the first time in a long while. (A.R. GAN 00256). When the plaintiff saw Dr. Conrad on July 31, 2006, she informed him that she intended to appeal the denial of her disability claim and gave him a copy of a letter she planned to submit in that regard. (A.R. GAN 00257). Dr. Conrad intended to follow up with the plaintiff on her disability claim as needed. (A.R. GAN 00257). The plaintiff informed Dr. Conrad that her medication was working "pretty well," and Dr. Conrad discussed with the plaintiff the necessity of her limiting her alcohol consumption. The plaintiff responded that she had limited her consumption to no more than two glasses of wine per day and told Dr. Conrad that she was going to try to "pick up her exercise" and might even start playing golf. (A.R. GAN 00257). Once again, Dr. Conrad continued the plaintiff's medications and stated that he would see her in two to three months. (A.R. GAN 00257).

Almost a month after her last visit – on August 14, 2006 – the plaintiff saw Dr. Beissinger, at which time the plaintiff discussed various medical issues, including her concern about the effects of Effexor and Paxil. (A.R. GAN 00260). The plaintiff mentioned an upcoming vacation and football season and discussed the anniversary of Hurricane Katrina, including the fact that it was a difficult topic that caused her to be depressed for a few days and to feel fragile and tearful. (A.R. GAN 00260). The plaintiff expressed a

desire to reduce her anxiety and fear and to increase her feelings of competency and power. (A.R. GAN 00260). When the plaintiff saw Dr. Beissinger later that month, on August 29, 2006, she was calm and reported a sense of relief as a result of the completion of repairs on her house, yard, and fence. (A.R. GAN 00261). The plaintiff again was having nightmares, but was progressing well in her treatment, having engaged in insight and reflection and begun to take better care of herself. (A.R. GAN 00261). Dr. Beissinger instructed the plaintiff to re-examine her self-assessment list and determine whether or not it was still accurate; she also discussed with the plaintiff feelings, ideas, and behaviors that would help the plaintiff feel safe even in dangerous circumstances. (A.R. GAN 00261).

Following her August 29, 2006, visit with Dr. Beissinger, the plaintiff did not receive any treatment for more than two months. When the plaintiff saw Dr. Conrad on October 31, 2006, she again reported that things were going okay for her, that she was relieved to be away from the newspaper, and that she was considering writing golf-related articles and traveling with her husband so she could write about things to do in the various locations they visited. (A.R. GAN 00262). The plaintiff also informed Dr. Conrad that she was exercising three to four times a week, but that she had not heard anything definitive about her disability claim. Dr. Conrad continued the plaintiff on her current medications and noted that he would see her again in three weeks. (A.R. GAN 00262). When the plaintiff saw Dr. Beissinger on November 13, 2006, she reported an upsetting dream in which she was escaping from an area where there was an explosive device near a car. (A.R. GAN 00263). She also told Dr. Beissinger about a vacation she had planned and discussed health issues and her mother. (A.R. GAN 00263). During her next visit with Dr. Beissinger, on December 5, 2006, the plaintiff reported being less depressed and anxious, but Dr. Beissinger indicated that the plaintiff's avoidance behavior continued, as did her flashbacks. (A.R. GAN 00264). The plaintiff was sad and frustrated by issues pertaining to her parents and, in particular, her mother, whom she reported refused to have a happy life. (A.R. GAN 00264). The plaintiff explained to Dr. Beissinger that she felt a sense of duty toward her parents, but was upset by the negativity that had surrounded her for her entire life and the fact that her mother was not receptive to her input on certain issues.

(A.R. GAN 00264). The plaintiff also informed Dr. Beissinger that she became nervous when anticipating a visit home and that she still could not drive in certain areas of the city. Although the plaintiff was having nightmares, they had decreased, and she was doing better with her exercise regimen. (A.R. GAN 00264). Dr. Beissinger noted that the plaintiff was progressing well in her treatment, but that she still had some features of agoraphobia and could not venture too far from home or go to unfamiliar places. (A.R. GAN 00264).

During the plaintiff's first visit with Dr. Beissinger in 2007, she was calm, sad, and angry, apparently due to certain memories. (A.R. GAN 00266). The plaintiff's affect was mildly flat and she had psychomotor retardation, along with fears and feelings of helplessness. (A.R. GAN 00266). The plaintiff was upset over continuing issues with her mother and discussed dysfunction in the work place, as well as verbal abuse, humiliation, and sarcasm from someone named "Tom" and her mother. (A.R. GAN 00266). The plaintiff denied having appetite or sleep problems and stated that the was exercising again; she also reported having nightmares, although they had decreased somewhat. (A.R. GAN 00266). According to Dr. Beissinger, the plaintiff's medication quelled her sense of panic and reduced her depression, and the plaintiff was still making good progress in her treatment. (A.R. GAN 00266). The plaintiff again presented to Dr. Beissinger sad and melancholy on January 15, 2007, this time because she did not know how to stop torturing herself. (A.R. GAN 00269). The plaintiff conveyed to Dr. Beissinger that her husband was under the impression, at least at times, that she did not want to be happy and reported that she could not get over thinking she is a bad person, a feeling that apparently stemmed from her teenage years and having a "sacrificial mother." (A.R. GAN 00269-70). After the plaintiff confided in Dr. Beissinger that she had concluded as an adolescent that she was bad, unworthy, and unlovable, Dr. Beissinger discussed with her the manner in which those feelings had shaped her self-perception. (A.R. GAN 00269). When the plaintiff saw Dr. Beissinger on January 29, 2007, Dr. Beissinger noted that the primary feature of the plaintiff's diagnoses was depression and sensitivity to crowds. (A.R. GAN 00271). Dr. Beissinger described the plaintiff's mood as sad and angry, but noted that she spoke in logical, goal-directed speech, reported no sleep or appetite problems, and communicated

a desire to maintain her exercise and weight loss.  (A.R. GAN 00271).  The plaintiff was still progressing well in her treatment, although she continued to report fears and difficulties in social and interpersonal interactions.  (A.R. GAN 00271).  The plaintiff informed Dr. Beissinger that the denial of her disability claim had been upheld and that she was distressed by notations in a letter from the policy administrator copied to Dr. Beissinger.  (A.R. GAN 00271).  Dr. Beissinger indicated that the plaintiff was depressed and anxious about the outcome of her disability claim and commented that a positive response to therapy did not mean the plaintiff could return to her stressful work environment and re-experience flashbacks, anxiety, and nightmares.[19]  (A.R. GAN 00271).  According to Dr. Beissinger, the plaintiff was continuing to learn coping strategies and increased feelings of safety and competency.  (A.R. GAN 00271).  During a January 31, 2007, session, Dr. Conrad indicated that the plaintiff was still struggling to some degree with her symptoms and was very worried about what was going to happen with her insurance since she had not been approved for LTD benefits.  (A.R. GAN 00272).  The plaintiff requested extra Xanax to take as needed, and Dr. Conrad switched the plaintiff from Effexor to Cymbalta to see if he could improve her antidepressant response and said that he would see her back in a month or two.[20]  (A.R. GAN 00272).

On February 19, 2007, the plaintiff was calm, according to Dr. Beissinger, but had thoughts of helplessness associated with her claim for LTD benefits.  (A.R. GAN 00273).  The plaintiff had neither sleep nor appetite problems, continued to exercise, and was progressing well in her treatment.  (A.R. GAN 00273).  Dr. Beissinger noted that the plaintiff was to continue to develop ideas with regard to her husband's work and that she felt that she and her husband were closer emotionally than they had ever been.  (A.R. GAN 00273).  Dr. Beissinger discussed certain health issues with the plaintiff, including her

---

[19]  Although Dr. Beissinger implied that the plaintiff suffered flashbacks, anxiety, and nightmares while working at the News Journal, there is no evidence to support that fact; even if there was, there is no evidence that the plaintiff's flashbacks, anxiety, or nightmares prevented her from performing her job.

[20]  As an example of an occasion on which the plaintiff felt a need for Xanax, Dr. Conrad cited an episode in which the plaintiff claimed to have a "panic spell" while looking for her daughter's lost dog.  (A.R. GAN 00272).

alcohol consumption and ways to modify it, and engaged in problem solving regarding the plaintiff's visits with her mother.  (A.R. GAN 00273).  According to Dr. Beissinger's notes, during the plaintiff's last visit with her mother, she "cried as if it was one last piece of grief over [her] mother ever being able to help her or love her the way she has wanted and then she just let it go," after which she felt a sense of peace.  (A.R. GAN 00274).  When the plaintiff saw Dr. Conrad on March 8, 2007, she was trying to figure out how to maintain her insurance with the News Journal.  (A.R. GAN 00275).  The plaintiff stated that she still had a lot of anxiety symptoms resulting from the PTSD she experienced in connection with Hurricane Ivan, which related back to the 1973 tornado.  (A.R. GAN 00275).  She also reported that Cymbalta was working well for her, so Dr. Conrad continued her on her current medications and stated that he would see her again in a couple of months.  (A.R. GAN 00275).  When the plaintiff saw Dr. Beissinger on March 12, 2007, she was calm and reported a good dream about her family.  Her thought content was unremarkable, other than fears, and she had no sleep or appetite problems and had made good progress in her treatment.  (A.R. GAN 00276).  The plaintiff informed Dr. Beissinger that her mother recently turned 82 years old and that she was sad about the manner in which her mother had chosen to live.  (A.R. GAN 00276).  The plaintiff also informed Dr. Beissinger that she was planning a vacation with her cousins.  (A.R. GAN 00276).  Finally, the plaintiff told Dr. Beissinger that she had an appointment with the human resources person at the News Journal and was prepared for the person to be rude to her.  (A.R. GAN 00276).  When the plaintiff saw Dr. Conrad on March 16, 2007, she reported good news from her appointment with News Journal staff – that she was eligible for retirement and to purchase insurance through the company in the approximate amount of her retirement benefits.  (A.R. GAN 00277).  The plaintiff also again reported that she hoped to assist her husband with his work and do some freelance work on her own in order to earn additional money.  (A.R. GAN 00277).  Dr. Conrad was pleased with the plaintiff's plan and thought she would be better off working than fighting for medical retirement, which could take years and exacerbate her PTSD.  (A.R. GAN 00277).  Once again, Dr. Conrad continued the plaintiff on her current medications and noted that he would see her again in two months.  (A.R.

GAN 00277).

On April 9, 2007, the plaintiff was calm, reported no sleep or appetite problems, and had progressed well in her treatment. (A.R. GAN 00278). However, she had intermittent tearfulness associated with discussions of her parents, including that her mother sacrificed her life for her but did so with great bitterness. Although the plaintiff reported a decrease in her depression, which resulted in an increase in her activity level and improved focus, she was still pessimistic and having difficulty dealing with the situation with her aging parents and especially her mother. (A.R. GAN 00278). The plaintiff discussed other family matters and religion, including the destruction of the church she attended as a child. (A.R. GAN 00279). The plaintiff reported that she had experienced two incidents of tightening in her chest and shortness of breath, but realized the symptoms could subside with time. (A.R. GAN 00278). Dr. Beissinger instructed the plaintiff to consciously reduce her stress by increasing joyful activities. (A.R. GAN 00278). When the plaintiff next saw Dr. Beissinger, on April 28, 2007, she was mildly anxious and lacking in energy, perhaps due to the anemia, under-eating, and/or low blood pressure she reported. (A.R. GAN 00280). Dr. Beissinger noted that the plaintiff had initial insomnia, although her fitfulness was much better with sleep medication, and that she had progressed only fairly in her treatment. (A.R. GAN 00280). The plaintiff was somewhat relieved by news that her sister had moved closer to her mother and could more easily and regularly check on her parents. The plaintiff also had gotten a dog, which had lifted her spirits and was attempting to generate ideas for a dog newspaper and working with another journalist in that regard, a prospect about which she was very enthusiastic. (A.R. GAN 00280-82). The plaintiff told Dr. Beissinger that she had asked questions of family members and revealed to an aunt that she had been diagnosed with PTSD, in response to which her aunt informed her that she had a cousin who has panic disorder and another who has obsessive compulsive disorder. (A.R. GAN 00281). The plaintiff mentioned that her aunt and uncle had never offered her anything to compensate for the sexual abuse by her uncle. (A.R. GAN 00281).

The plaintiff saw Dr. Beissinger again on May 3, 2007, at which time she was angry and frustrated and expressed fear and feelings of powerlessness. (A.R. GAN 00283). The

plaintiff reported no sleep or appetite problems, had progressed fair to well in her treatment, and was responding positively to her medication. (A.R. GAN 00283). According to Dr. Beissinger's notes, however, the plaintiff was enormously frustrated over insurance issues and the News Journal, reporting that there had been different people in the human resources position over short periods of time and a change in administrators.[21] (A.R. GAN 00283). The plaintiff informed Dr. Beissinger she would not have insurance after May 30, 2007, was too young to retire, and workers compensation did not cover mental issues. (A.R. GAN 00284). Finally, the plaintiff indicated she had slept poorly the previous night and was very worried about and frustrated by the situation, particularly given that she had worked for the News Journal for twenty-six years. (A.R. GAN 00283). During her next visit with Dr. Beissinger, on May 17, 2007, the plaintiff was calm, sad, and lacking in energy. (A.R. GAN 00285). Once again, the plaintiff expressed thoughts of helplessness and initial insomnia, and Dr. Beissinger noted that she was having recurrent flashbacks during storms and bad dreams. (A.R. GAN 00285). The plaintiff described her recent visit home for her father's 85th birthday and the anticipatory anxiety she experienced in relation thereto. (A.R. GAN 00285). The plaintiff also reported that she felt helpless and sad because there was nothing she could do to change her parents' lives and attitudes and that she was reminded of the guilt, shame, and disgrace she had felt as a result of her mother's sacrifices. (A.R. GAN 00285). The plaintiff informed Dr. Beissinger that her husband was taking Trazodone and Zoloft to treat depression and poor sleep and that she had consulted an attorney in connection with her disability claim. The plaintiff mentioned a number of individuals who worked at the News Journal and feelings of alienation and exclusion associated with the newsroom environment.[22] (A.R. GAN 00286).

---

[21] The plaintiff reported that there had been a change in providers, but actually the change was in administrators.

[22] Dr. Beissinger made more notes than usual during the May 17 session, which appear to pertain to the plaintiff's mental condition, including its history, symptoms, causes, as well as medications she had taken, and possibly to be related to her claim for disability benefits. (A.R. GAN 00287).

When the plaintiff saw Dr. Conrad on May 18, 2007, she informed him that the insurance plan she discussed with him during her last visit did not materialize and that she was going to have to institute legal proceedings. (A.R. GAN 00289). She gave Dr. Conrad a copy of an independent evaluation of her claim prepared by a physician hired by Prudential. (A.R. GAN 00289). Dr. Conrad was discouraged by the news and feared that litigation would be difficult for the plaintiff emotionally; he stated that he would try to do whatever he could to help the plaintiff with her claim. (A.R. GAN 00289). Dr. Conrad continued the plaintiff on her current medications and said that he would see her again in six weeks. (A.R. GAN 00289). When the plaintiff saw Dr. Beissinger a month later, on June 18, 2007, she was calm and mildly anxious, had an unremarkable thought content, except for fear, and reported no sleep or appetite problems but continued weight loss through intake management and exercise. (A.R. GAN 00290). Dr. Beissinger noted that the plaintiff's medication had reduced her symptoms and she was progressing well in her treatment, but that panic was "still on the edge." (A.R. GAN 00290). The plaintiff reported that her new dog made her laugh out loud and she discussed exercise, concern over family members' financial problems, and her parents' health. (A.R. GAN 00290). Dr. Beissinger instructed the plaintiff to focus on exercise and a hobby. (A.R. GAN 00290).

Although the plaintiff presented to Dr. Beissinger on July 2, 2007, sad and anxious, with reports of fear and sleep disturbances, Dr. Beissinger noted that she had improved with medication. (A.R. GAN 00291). The plaintiff reported that communication with her husband had improved since he "initiated case for himself" regarding PTSD resulting from his experiences in Vietnam and that she and her husband had provided video statements in support of her disability claim. (A.R. GAN 00291). The plaintiff also told Dr. Beissinger that she was under increased stress from storms in the area and was having flashbacks about Hurricane Ivan, the tornado in her hometown, and the sexual abuse by her uncle. The plaintiff felt that increased stress aggravated her PTSD symptoms and reported feeling panicky, lightheaded, and having heart flutters. (A.R. GAN 00291-92). Dr. Beissinger worked with the plaintiff to attempt to distinguish past events from her current competencies to ensure a sense of safety and to decrease the plaintiff's current isolation.

(A.R. GAN 00291). When Dr. Conrad saw the plaintiff on July 5, 2007, he noted that she was still struggling with her disability claim, but had hired an attorney to assist her. (A.R. GAN 00293). The plaintiff told Dr. Conrad that her medication seemed to be working reasonably well since she was sleeping okay and that she believed she could work part-time but would be overwhelmed by the pressures of a full-time job. (A.R. GAN 00293). Dr. Conrad added that anything related to hurricanes and weather would be extremely difficult for the plaintiff and encouraged the plaintiff to engage in more activities, such as writing and volunteering. (A.R. GAN 00293). The plaintiff told Dr. Conrad that she was avoiding alcohol, for the most part, and Dr. Conrad continued her current medications and planned to see her again in two months. (A.R. GAN 00293).

When the plaintiff saw Dr. Beissinger on July 17, 2007, she was calm, but reported fears and heightened anxiety because of hurricane season. (A.R. GAN 00294). The plaintiff denied having sleep or appetite problems and was progressing well in her treatment. (A.R. GAN 00294). The plaintiff also was experiencing a closer, more intimate bond with her husband. (A.R. GAN 00294). The plaintiff reported that she had worked with a colleague on an idea for a newsletter, but that they were only in a data gathering stage. (A.R. GAN 00294). She stated there was a time after Hurricane Ivan when she could not drive downtown to familiar places or go in the vicinity of the News Journal because of anxiety and panic symptoms, including a sense of loss of mapping skills, increased heart rate, and lightheadedness, and that she avoided trips to stores and restaurants in the area.[23] (A.R. GAN 00294-95). The plaintiff saw Dr. Beissinger again on July 31, 2007, at which time her primary concern was her step-daughter's marital situation. (A.R. GAN 00297). The plaintiff purported to be sad and in shock over the situation and particularly worried about her step-granddaughter's safety. (A.R. GAN 00297). The plaintiff nevertheless reported having no sleep or appetite problems and was progressing well in her treatment. (A.R. GAN 00297).

---

[23] Although the plaintiff indicated that she was unable to go downtown after Hurricane Ivan because of anxiety and panic attacks, she continued to work for almost a year after the hurricane, and there is no evidence in the record that she was ever absent from work because of her alleged anxiety or panic attacks.

Although the plaintiff was anxious and fidgety on August 14, 2007, Dr. Beissinger noted that her symptoms were stable with medication. (A.R. GAN 00298). The plaintiff expressed fear and guilt over not being closer to her mother and able to offer more assistance. The plaintiff discussed health problems and her mother's refusal to let her help or get other assistance with tasks and stated that she anticipated deterioration in her mother's environment in terms of cleanliness, care, and nutrition. (A.R. GAN 00298). After the plaintiff informed Dr. Beissinger that she had newsroom flashbacks when watching the weather, Dr. Beissinger suggested that her husband help by teaching her to be more selective and self-protective. (A.R. GAN 00298-99). Dr. Beissinger also worked with the plaintiff to address her fears on a more rational basis and to develop strategies to decrease her hyper-responsiveness to information regarding child abuse, destructive news events, and safety issues. (A.R. GAN 00299). When the plaintiff saw Dr. Conrad on August 27, 2007, she reported having difficulty with her level of functioning. (A.R. GAN 00301). She had been anxious about family issues and indicated that she was not sleeping well and lacked the energy to focus on things to the extent she would like because of a preoccupation with worry; the plaintiff nevertheless hoped to be able to work on publications at some point. (A.R. GAN 00301). Dr. Conrad continued the plaintiff on her current medications, but noted that he might need to consider a change to increase the plaintiff's energy if her motivation did not improve. (A.R. GAN 00301). When the plaintiff saw Dr. Beissinger the next day, she was anxious and under increased stress, reporting fears as well as concern and dismay over her family situation. (A.R. GAN 00302). The plaintiff reported initial insomnia, but denied having appetite problems. (A.R. GAN 00302). Dr. Beissinger commented that the plaintiff's insight was good, but that there was a current increase in her anxiety associated with the breakup of her stepdaughter's marriage, which the plaintiff discussed in detail and revealed had been the cause of her recent upset. (A.R. GAN 00302). Dr. Beissinger focused on how critical it was that the plaintiff not be overwhelmed or pulled into the trauma of the breakup and noted that the plaintiff realized her boundaries and the behavior necessary for her to avoid being consumed by the details of this family situation. (A.R. GAN 00302).

The plaintiff's final visit with Dr. Beissinger, as reflected in the record, was on September 13, 2007. (A.R. GAN 00304). At that time, the plaintiff was anxious and reported fears, worry, and frustration, but was managing her symptoms, setting goals, and protecting herself from some of the memories associated with childhood emotional and sexual abuse and PTSD. (A.R. GAN 00304, 00306). The plaintiff's greatest concern was her inability to get health insurance. (A.R. GAN 00304). According to Dr. Beissinger's notes, the plaintiff mentioned that her husband had a better understanding of her PTSD and that both the plaintiff and her husband realized they had been more depressed because of the situation with the plaintiff's stepdaughter and planned to commit themselves more to consciously improving the manner in which they experience their own lives. (A.R. GAN 00304). Although the plaintiff reflected a better sense of confidence and ability to step back from the anxiety and loss and observe it instead of being in the midst of it, Dr. Beissinger noted the need to work further with the plaintiff on cognitive restructuring. (A.R. GAN 00305). Dr. Beissinger also noted for the first time on September 13 that the plaintiff was anxious in response to intervention.

**B.      Plaintiff's Initial Application for LTD Benefits**

   **1.      Evidence Submitted in Support of Plaintiff's Claim**

Although the plaintiff did not provide treatment records prior to October 15, 2005, the record reflects that she took a leave of absence from her job on September 7, 2005, and began receiving STD benefits on September 14, 2005. (A.R. GAN 0.0193). The plaintiff became eligible for LTD benefits on March 8, 2006, and submitted an application for LTD benefits on February 20, 2006. (A.R. GAN 00193). In support of her application, the plaintiff submitted a claim form (A.R. GAN 00196), a Group Disability Insurance Comprehensive Claimant Statement (A.R. GAN 00189-91), a Group Disability Insurance Psychotherapy Notes Authorization (A.R. GAN 00192), an Attending Physician Statement by Dr. Conrad, and a narrative by Dr. Beissinger. (A.R. GAN 00197). It appears that Holly Stevenson, a Gannett employee, also completed and submitted a form called "Group Coverage Claim for Long Term Disability Benefits" on the plaintiff's behalf. (A.R. GAN 00193).

On her claim form, the plaintiff stated that she had suffered from PTSD and depression for "30-plus years" and that her limitations and symptoms prevented her from performing her usual job duties because "work aggravates [and] contributes to [her] condition." (A.R. GAN 00196). When asked whether she expected to return to work, the plaintiff replied "unknown at this time." She identified Dr. Conrad and Dr. Beissinger as her treating physicians and indicated that they agreed that she would be "better able to cope by not working." (A.R. GAN 00196). In her Group Disability Insurance Comprehensive Claimant Statement, the plaintiff stated that she was being treated for major depression, PTSD, and anxiety and was taking Effexor, Trazodone, and Xanax. (A.R. GAN 00189). She also stated that she received therapy approximately three times a month and that it helped her to "cope with daily life." (A.R. GAN 00189). According to the plaintiff, after she stopped working, her sleep and anxiety level improved. (A.R. GAN 00189). When asked how her condition prevented her from working, the plaintiff responded "yes." (A.R. GAN 00189). She was uncertain as to the types of work she would be able to perform at that time or in the future and failed to list any accommodations she felt would enable her to return to work. (A.R. GAN 00189). The plaintiff indicated that she was capable of attending to her own daily needs, such as dressing and hair care, and when asked about her daily activities, the plaintiff stated that she exercised when possible and spent time with her family and pets; the plaintiff identified no hobbies or activities that helped her occupy her time. (A.R. GAN 00189).

In an Attending Physician's Statement submitted on or about February 14, 2006, Dr. Conrad stated that he had been treating the plaintiff since July 3, 2003, and that she had stopped working because of depression and stress from hurricanes.[24] (A.R. GAN 00197). According to Dr. Conrad, the plaintiff had recently experienced a decrease in concentration and motivation, along with an increase in anxiety and panic. (A.R. GAN 00189). Dr. Conrad stated that the plaintiff had been diagnosed with major depression and PTSD, identified her job and hurricanes as psychological stressors, and rated her global

---

[24] Dr. Conrad's handwriting is also somewhat illegible at times.

functioning as 50 on a scale of 1 to 100, which indicates, according to the *Diagnostic and Statistical Manual of Mental Disorders,* that she had serious symptoms, such as suicidal ideation, severe obsessional rituals, or frequent shoplifting, or a serious impairment in social or occupational functioning, such as no friends and being unable to keep a job. (A.R. GAN 00197). *See* AMERICAN PSYCHIATRIC ASSOCIATION: *Diagnostic and Statistical Manual of Mental Disorders*, Text Revision (4th ed. 2000). When asked if the plaintiff had made significant progress, Dr. Conrad stated that she continued to have depression and anxiety despite medication and psychotherapy and opined that she would reach maximum recovery within six months to one year, but was limited in the work she could perform until she recovered because of poor concentration and marked anxiety and panic. (A.R. GAN 00198, 00224). Finally, Dr. Conrad was uncertain as to any future changes in the plaintiff's prognosis or permanent limitations on her ability to function. (A.R. GAN 00198).

## 2. Prudential's Decision Denying Plaintiff's Initial Claim

On August 29, 2006, Prudential wrote to the plaintiff, acknowledging receipt of her appeal and requesting additional information.[25] (A.R. GAN 00115-16). Prudential explained that, under the Plan, the plaintiff must provide certain proof of disability, including restrictions and limitations preventing her from performing her job, and requested copies of medical records from Dr. Conrad and Dr. Beissinger, as well as the plaintiff's treating physician at the time she stopped working.[26] (A.R. GAN 00115-16). The plaintiff responded to Prudential on September 18, 2006, explaining that she was under the care of Drs. Beissinger and Conrad and that, before she sought treatment from Dr. Conrad, her primary care physician had prescribed anti-depressant and anti-anxiety medication, including Zoloft, Wellbutrin, Prozac, and Xanax. (A.R. GAN 00188). The plaintiff stated that Dr. Conrad prescribed Effexor, rather than Zoloft, Wellbutrin, or Prozac, and

---

[25] Prudential informed the plaintiff that it had tolled the time for handling her appeal pending receipt of the requested information.

[26] Because the plaintiff submitted no medical records from Dr. Beissinger or Dr. Conrad preceding or corresponding with the date of her leave of absence, Aetna erroneously assumed there was another treating physician who had placed the plaintiff on medical leave.

substituted Clonazepam and Trazodone for Xanax.  (A.R. GAN 00188).

Prudential denied the plaintiff's claim on April 5, 2006, finding insufficient evidence that the plaintiff suffered from active symptoms of major depression or PTSD and was unable to perform the material and substantial duties of her occupation during the pertinent period.  (A.R. GAN 00094-95).  Specifically, Prudential noted that, in order to receive LTD benefits under the Plan, the plaintiff had to be disabled from September 7, 2005, through March 7, 2005, and that, according to the limited medical records it had received, the plaintiff's condition improved during that time.[27]  (A.R. GAN 00095).  Prudential acknowledged that the plaintiff had a long history of depression, but noted that she had worked with it in the past while receiving treatment, and that, even though her condition had improved, the plaintiff nevertheless intended to remain out of work and change her life.  (A.R. GAN 00095).  According to Prudential, the plaintiff's medical records did not "document current active symptomatology that would support the criteria for a Major Depression" in that there were no documented cognitive deficits and no evidence of disturbed sleep or appetite, suicidal ideation, hopelessness, anhedonia, or vegetative symptoms of a disabling depression.  (A.R. GAN 00095).  Moreover, there had been no change in the plaintiff's medications, which had been documented as effective for her.[28]  (A.R. GAN 00095).  Prudential likewise concluded that there were no active symptoms supporting the plaintiff's PTSD diagnosis, as there were no indications of intrusive thoughts, nightmares, flashbacks, increased startled response, dissociative episodes, cognitive deficits, or hyper vigilance.  (A.R. GAN 00095).  Prudential notified the plaintiff that she had a right to appeal its decision within 180 days of the date of her receipt of its letter and set forth the process for doing so.  (A.R. GAN 00095).

---

[27]  At the time it denied the plaintiff's claim, Prudential had only a portion of the plaintiff's medical records.

[28]  As discussed above, Dr. Conrad subsequently modified the plaintiff's medications on two occasions – on April 24, 2006, he changed the plaintiff's sleep medication, and on January 23, 2007, he substituted Cymbalta for Effexor and prescribed extra Xanax at the plaintiff's request.

**C.    Plaintiff's First Appeal**

 **1.    Evidence Submitted in Support of Plaintiff's First Appeal**

  a.    Letter from the Plaintiff

The plaintiff appealed the denial of her claim through a letter in which she explained that she had a long history of depression and PTSD and identified the factors she felt contributed to it, which included her dysfunctional family, sexual abuse, and the tornado that destroyed her hometown. (A.R. GAN 00098). The plaintiff stated that she had been under the care of a number of therapists since her early 20s and had taken a variety of medications for anxiety and depression. (A.R. GAN 00100). The plaintiff described her reporting of Hurricane Ivan for the News Journal[29] and stated that, after the hurricane, she began having flashbacks and nightmares, which were rekindled by Hurricane Katrina. (A.R. GAN 00100). She added that she battled fatigue and anxiety every day, frequently wanting to stay in bed or do nothing, lost ten pounds after the hurricanes, and avoided social contact, particularly with anyone with whom she had worked. (A.R. GAN 00100). She explained that she panicked and avoided any activity when severe weather was possible and constantly looked for a hiding place. (A.R. GAN 00100). Although she purportedly excelled for years covering politics and various tragedies, the plaintiff claimed to have reached a point of desperation after the hurricanes and a "feeling that [she] could not face it any more." (A.R. GAN 00100). While she admittedly had the intellect, education, and training to perform as a journalist, she did not feel she was able to fulfill the daily tasks required of her in her job. (A.R. GAN 00098). Notably, the plaintiff did not describe any specific task she was unable to perform, stating only that she reached a point

---

[29] In particular, the plaintiff stated that she wrote articles and worked behind the scenes throughout the storm, releasing information on the internet when the News Journal was unable to publish. (A.R. GAN 00100). She chose to remain in the News Journal building during the storm despite the fact that it was located in an evacuation and flood zone and was then "chased off a devastated Pensacola Beach by special operations soldiers in riot gear" as she tried to gather information for an article that would provide the "first glimpse" of the damage caused by the hurricane. (A.R. GAN 00100-01). She worked on numerous damage and recovery stories following the hurricane before becoming overwhelmed by the situation. (A.R. GAN 00100).

Case No.: 3:08cv113/MCR/MD

of mental, emotional, and physical collapse and did not feel that she could return to work.[30] Finally, the plaintiff acknowledged that Dr. Beissinger and Dr. Conrad had encouraged her to plan for the future and that she had considered several possibilities for future employment. (A.R. GAN 00098).

  b. Letter from Treating Physician

  Dr. Conrad also wrote Prudential in response to its denial of the plaintiff's claim in an effort to clarify what he perceived to be errors in Prudential's reasoning. (A.R. GAN 00251). In his April 26, 2006, letter, Dr. Conrad explained that the plaintiff's disability was due largely to PTSD, brought on by the hurricanes and plaintiff's reporting of the same, and she would not fully recover working in such an emotionally charged atmosphere. (A.R. GAN 00251). According to Dr. Conrad, the plaintiff's symptoms subsided after she quit working and would be exacerbated by her return to work. (A.R. GAN 00251). Dr. Conrad noted that the plaintiff's depression also had improved, but stated that she was not "functioning at a level that would allow her to return to work productively." (A.R. GAN 00251). In conclusion, Dr. Conrad suggested that Prudential have the plaintiff independently evaluated. (A.R. GAN 00251).

  c. Statement from Dr. Beissinger

  Like Dr. Conrad, Dr. Beissinger provided a statement to Prudential in response to its denial of the plaintiff's claim. In her statement, which appears to consist largely of notes from the plaintiff's initial visit, Dr. Beissinger recorded her initial impressions of the plaintiff, as well as the history of the plaintiff's illness and the plaintiff's family and social history. (A.R. GAN 00180-82). In discussing the plaintiff's illness, Dr. Beissinger stated that the plaintiff had experienced significant stress, both personally and professionally, over the past twenty years and, with regard to her work for the News Journal, "realizes she is always facing an immediate deadline, an editor, or a news situation which draws her into high emotional circumstances on a daily basis." (A.R. GAN 00180). According to Dr. Beissinger, the plaintiff "believes her own history exacerbates her emotional

---

[30] The plaintiff also noted that more and larger storms were predicted in the future. (A.R. GAN 00101).

responsiveness to these situations, and, in that regard, causes her to feel drained or depleted on a regular basis." (A.R. GAN 00180). Dr. Beissinger noted that the plaintiff had a twenty-five year career as a journalist, admitted to being exposed to increasing stressors in the past few years, and felt that she was unable to cope like she once did. (A.R. GAN 00180). The plaintiff indicated to Dr. Beissinger that she was nervous and unsettled most of the time and slept poorly. (A.R. GAN 00180). Dr. Beissinger noted that the plaintiff continued to have flashbacks and nightmares and that Hurricane Katrina produced in the plaintiff "extreme feelings of sadness, loss, grief and fear." (A.R. GAN 00182). Dr. Beissinger stated that Dr. Conrad continued to treat the plaintiff for PTSD symptoms and that she saw the plaintiff on a continuing basis for therapy approximately twice a month. (A.R. GAN 00180). Finally, Dr. Beissinger opined that the plaintiff could not "operate well in a stressful environment because of previous cumulative trauma in her life" and that returning to work would "further increase symptoms associated with PTSD," but acknowledged that the plaintiff's cognitive skills were in tact and that her intellectual functioning was normal. (A.R. GAN 00182).

### 2. Peer Review

On or about December 22, 2006, Prudential arranged for an independent review of the plaintiff's claim to provide clarification, from a psychiatric perspective, of the plaintiff's level of functioning during the pertinent period. (A.R. GAN 00118-119, 00167). Dr. Stuart Shipko, who is Board certified in Psychiatry and Neurology, performed the review and prepared a report on January 3, 2007, setting forth his findings.[31] (A.R. GAN 00166-72). Like Prudential, Dr. Shipko concluded there was no support for the plaintiff's claimed impairment and no recorded symptoms that actually interfered with the plaintiff's ability to function. (A.R. GAN 00166-72). Contrary to the plaintiff's subjective reports, Dr. Shipko found that Dr. Beissinger's notes indicated only mild symptoms of psychiatric illness with no severe symptoms of anxiety or depression. (A.R. GAN 00168). Dr. Shipko acknowledged that the plaintiff's purported symptoms may have been aggravated by the

---

[31] Dr. Shipko reviewed the information in Prudential's file, but did not perform an independent medical examination of the plaintiff.

work she performed after the hurricanes, but opined that those symptoms were longstanding and present while the plaintiff worked full-time. (A.R. GAN 00171). As Dr. Shipko noted, the plaintiff provided far more detail regarding the alleged causes of her mental illness in her appeal letter than either of her treating physicians set forth in their notes. (A.R. GAN 00169). According to the records of her treating physicians, the plaintiff's primary complaints pertained to family relations and personal growth, with little mention of an inability to function, much less of symptoms of a debilitating condition. (A.R. GAN 00168). Dr. Shipko found Dr. Beissinger's statements in support of the plaintiff's claim inconsistent with her treatment notes. (A.R. GAN 00167). For example, while the statements provided to Prudential indicated the plaintiff had made no progress in her treatment, Dr. Beissinger's treatment notes consistently reflect good to excellent progress with largely normal mental status examinations. (A.R. GAN 00167). Moreover, although the plaintiff had been seeing Dr. Beissinger approximately once every two weeks, Dr. Shipko observed that the frequency of her treatment declined in early 2006 with only sporadic treatment thereafter, indicating the plaintiff had improved. (A.R. GAN 00167). Dr. Shipko believed the plaintiff never intended to return to work at the News Journal following her leave of absence and, instead, was considering other employment options, observing that, in a September 9, 2004, letter to her supervisor, the plaintiff expressed dissatisfaction with her job, a fact also noted by Dr. Beissinger in her treatment notes. (A.R. GAN 00167, 00169, 00171).

Dr. Shipko noted similar inconsistencies in Dr. Conrad's statements and treatment notes. (A.R. GAN 00169-70). Although Dr. Conrad indicated in an attending physician statement prepared after a February 2, 2006, visit that the plaintiff's functioning was limited by impaired concentration and that she had not improved despite treatment with medication, Dr. Conrad's treatment notes suggest that the plaintiff's medications, in fact, were effective in treating her condition from November 7, 2005, forward and that she had improved. (A.R. GAN 00168). Like Dr. Beissinger, Dr. Conrad did not identify – and Dr. Shipko did not discern from Dr. Conrad's notes – any functional impairment or the severity, frequency, or duration of any alleged symptom that would have precluded the plaintiff from

returning to work. (A.R. GAN 00168-69). As Dr. Conrad's notes reflect, when the plaintiff went on leave on September 7, 2005, she clearly did not intend to return to her former position and, instead, was considering other employment options.[32] (A.R. GAN 00168). Dr. Shipko concluded that the record, as a whole, reflected only mild symptoms that would not have precluded the plaintiff from performing her job at the News Journal and that the plaintiff's purported inability to work was related to job dissatisfaction.[33] (A.R. GAN 00168-69, 00171-72). Any restrictions imposed by Dr. Beissinger or Dr. Conrad were merely preventative, according to Dr. Shipko, and not necessitated by any current symptoms or functional impairment. (A.R. GAN 00172).

### 3. Prudential's decision denying plaintiff's first appeal

On January 10, 2007, Prudential wrote to the plaintiff, informing her of its decision to uphold the denial of her claim. (A.R. GAN 00213-16). Prudential recounted the history of the plaintiff's claim, including the limited documentation submitted by the plaintiff and its efforts to obtain additional information. (A.R. GAN 00214). Prudential informed the plaintiff that, based on the information in its file – notably, the medical records – it concluded that she did not suffer from a psychological or cognitive impairment that prevented her from performing the material and substantial duties of her occupation during the elimination period. (A.R. GAN 00215). Prudential advised the plaintiff of her right to appeal and

---

[32] Specifically, during her December 13, 2005 visit, the plaintiff told Dr. Conrad that she did not intend to return to work and, on February 2, 2006, she informed Dr. Conrad that she was looking at other options and considering working with animals. On March 15, 2006, the plaintiff reported that she was doing okay, moving forward with her life, and trying to determine what she wanted to do in terms of work. The plaintiff again reported to Dr. Conrad on October 31, 2006, that things were going okay for her and that she was considering writing golf-related articles and traveling with her husband so she could write about the places they visited. (A.R. GAN 0262). As of July 17, 2007, the plaintiff and a former colleague were working on an idea for a newsletter. (A.R. GAN 00294). Finally, on August 27, 2007, the plaintiff reported that she was hoping to eventually work on a publication. (A.R. GAN 00301).

[33] As Dr. Shipko mentioned in his report, the plaintiff wrote to her supervisor on September 9, 2004, apologizing for "mouth[ing] off" to a co-employee in the newsroom and expressing concern about "communication problems and inconsistencies" that affected her work, as well as the work of other staff members. (A.R. GAN 00380). The plaintiff primarily complained about edits to her work, which she described as "demoralizing and confusing," as well as the lack of respect shown to reporters. (A.R. GAN 00380). Moreover, as mentioned, the plaintiff commented to Dr. Beissinger that five other reporters had left the News Journal due to problems with management, and the plaintiff expressed thoughts of alienation and exclusion associated with the newsroom environment. (A.R. GAN 00254, 00286).

explained the process for doing so.  (A.R. GAN 00216).

## D.    Plaintiff's Second Appeal

The plaintiff appealed Prudential's decision on May 17, 2007, after retaining counsel.  (A.R. GAN 00332).  Several weeks later, the plaintiff requested additional time in which to provide further information in support of her claim.  (A.R. GAN 00337).  Aetna agreed to the additional time and informed the plaintiff, by letter dated July 13, 2007, that it would place its review of her claim on hold pending receipt of the information.[34]  (A.R. GAN 00050).  On August 3 and 4, 2007, and again on October 10, 2007, the plaintiff submitted additional information, including sworn statements by Dr. Conrad and Dr. Beissinger and a report prepared by a vocational rehabilitation consultant.[35]  (A.R. GAN 00307-15, 00316-22, 00378).

### 1.    Additional Evidence Submitted in Support of Plaintiff's Second Appeal

#### a.    Physician's Statements

##### 1)    Dr. Conrad

In his sworn statement, Dr. Conrad opined that the plaintiff was unable to perform the material and substantial duties of her occupation as a reporter during the applicable period.  (A.R. GAN 00310, 00318).  When asked about the bases of his opinion, Dr. Conrad explained that whenever the plaintiff was faced with the prospect of entering her former place of employment, meeting with her superiors, or having to perform as a reporter, she would suffer a panic attack.[36]  (A.R. GAN 00314).  The plaintiff's anxiety, according to Dr. Conrad, made it difficult for her to focus, concentrate, work efficiently, and cover news stories in new or strange places.  (A.R. GAN 00310).  Dr. Conrad opined that

---

[34]  By the time of the plaintiff's second appeal, Aetna had taken over as claims administrator.  (A.R. GAN 00331).

[35]  The plaintiff also submitted a listing of her appointments with Dr. Beissinger through 2006; her job description; additional medical records from Dr. Beissinger and Dr. Conrad, which are discussed above; and her sworn statement, as well as that of her husband.

[36]  There is no evidence in the record that the plaintiff ever suffered a panic attack at work.  There likewise is no evidence in the record that the plaintiff ever contemplated returning to the News Journal for any purpose other than one meeting to discuss her insurance, and there is no indication that she had a panic attack in connection with that meeting.

the perceived "change in the political climate at the newspaper" contributed to the plaintiff's difficulties, as well as those of several other employees, due to the uncertainty it created. (A.R. GAN 00310). When asked to rate the plaintiff's degree of social functioning, Dr. Conrad responded that she had moderate difficulty in that regard, and when asked to estimate the frequency of plaintiff's deficiencies of concentration, persistence, or pace, resulting in failure to complete tasks in a timely manner in a work setting or elsewhere on a scale of none, seldom, often, frequent, or constant, Dr. Conrad responded that "often" was the best answer, explaining that such problems would routinely occur for the plaintiff because of her anxiety and panic. (A.R. GAN 00310). Dr. Conrad further indicated that, because of her anxiety and panic upon entering a work situation, the plaintiff had marked episodes of deterioration in a work setting causing withdrawal from the situation or exacerbation of signs and symptoms. (A.R. GAN 00310). Dr. Conrad described the plaintiff's ability to respond appropriately to supervision as marked due to the change in management and the plaintiff's apparent feelings of inadequacy and proneness to panic. (A.R. GAN 00310-11). Dr. Conrad explained that the plaintiff's depression "makes it so that she really is not nearly as motivated, she doesn't maintain her day-to-day concentration as well, and her brain just doesn't literally work as well." (A.R. GAN 00311). All of these things, according to Dr. Conrad, played a factor in the plaintiff's ability to be a good reporter and maintain her current job.[37] (A.R. GAN 00311). Dr. Conrad acknowledged that the plaintiff's condition had improved as a result of not working, but stated "there's no indication now that if she were to go back to work that she would be able to function there." (A.R. GAN 00312). Although Dr. Conrad concluded that the plaintiff could not go back to work as a full-time reporter and "certainly not in those kinds of settings where she's going to be encountering a lot of emotional turmoil," he admitted that he never encouraged the plaintiff to take a leave of absence from her job at the News Journal. (A.R. GAN 00313-14).

---

[37] Not only is there no evidence that the plaintiff had performance problems while working for the News Journal, but the plaintiff admitted to receiving a merit pay increase each year she worked for the News Journal and a positive final job review. (A.R. GAN 00101).

Case No.: 3:08cv113/MCR/MD

2)    Dr. Beissinger

In her sworn statement, Dr. Beissinger opined that the plaintiff's inability to perform her job was precipitated by her covering of Hurricane Ivan, which brought about symptoms of PTSD, including flashbacks and appetite and sleep disturbance, which were exacerbated by Hurricane Katrina.  (A.R. GAN 00317).  According to Dr. Beissinger, the plaintiff was panicking, "numbing up," and having anxiety attacks.  (A.R. GAN 00317).  Dr. Beissinger explained that, following Hurricane Ivan, the plaintiff had difficulty going downtown in the vicinity of the News Journal because of her anxiety and panic attacks.[38] (A.R. GAN 00319).  When asked about the bases of her opinion that the plaintiff was unable to perform the material and substantial duties of her occupation, Dr. Beissinger responded that there is no predictability for a reporter and that the plaintiff would be assigned to cover stories that would be traumatic for her, which would exacerbate her symptoms.[39]  (A.R. GAN 00318).  Dr. Beissinger stated that the plaintiff remained unable to work because, as of July 25, 2007, she was still having occasional panic attacks and flashbacks, although she had improved since she quit working.  (A.R. GAN 00319).  Dr. Beissinger acknowledged that, while the plaintiff still had anxiety, depression, and sleep disturbance, her condition was being adequately managed by her medications and that the plaintiff had explored the possibility of returning to work and would be able to do so as a writer, but not a reporter, if she were able to control her environment and assure her safety.  (A.R. GAN 00320-21).  Like Dr. Conrad, Dr. Beissinger concluded that the plaintiff would not perform adequately in a role in which she was required to report on murders, deaths, suicides, traumas, or environmental dangers.  (A.R. GAN 00321).

b.    Vocational Rehabilitation Report

On October 10, 2007, the plaintiff submitted a report prepared by Sheila Justice, a

---

[38]  The plaintiff nevertheless worked for almost a year after Hurricane Ivan before taking a leave of absence from her job.  As noted in fn.23, there is no evidence in the record that the plaintiff ever missed work due to anxiety.

[39]  As will be discussed in more detail below, there is no evidence in the record that the plaintiff was *required* to cover tragic stories.

Case No.: 3:08cv113/MCR/MD

vocational rehabilitation consultant. (A.R. GAN 00131-32). In preparing her report, Justice relied on the medical records and sworn statements of Dr. Beissinger and Dr. Conrad, as well as Dr. Shipko's report, the plaintiff's job description, the disability claim file, and her interview with the plaintiff. Based on the information available to her,[40] Justice concluded not only that the plaintiff was unable to perform the material and substantial duties of her occupation as a news reporter, but also that she was not able to perform any job for which she was reasonably qualified.[41] (A.R. GAN 00343). In so concluding, Justice acknowledged Dr. Shipko's report, but discounted it because Dr. Shipko never treated or interviewed the plaintiff. (A.R. GAN 00344).

## B.  Additional Peer Review

Following the plaintiff's second appeal, Aetna retained a psychologist, Lawrence Burnstein, to conduct an independent review of the plaintiff's claim. (A.R. GAN 00173). Dr. Burnstein's findings are set forth in a report prepared on December 13, 2007. (A.R. GAN 00178). Like Dr. Shipko, Dr. Burstein observed that Dr. Beissinger's notes do not contain any specific examples of behavior or measurements of the plaintiff's cognitive functioning to corroborate the plaintiff's subjective complaints or to confirm Dr. Beissinger's impressions. (A.R. GAN 00175). Rather, the plaintiff's mental status was typically described by Dr. Beissinger as being within normal limits. (A.R. GAN 00175). Moreover, although the plaintiff complained of panic, nightmares, anxiety, and depression, there was no indication that the plaintiff's symptoms impaired her ability to function. (A.R. GAN

---

[40]  More particularly, Justice's conclusion was based on the limitations noted by Dr. Beissinger and Dr. Conrad, including the plaintiff's moderate difficulty in social functioning, which Justice opined would interfere with her ability to interact with co-workers, customers, and/or clients; deficiencies in concentration, persistence, and/or pace resulting in frequent failure to timely complete tasks, which Justice opined would render the plaintiff an unreliable worker in any field; marked deterioration in a work setting causing withdrawal or exacerbation of signs and symptoms, which Justice opined rendered the plaintiff unable to maintain any employment; and marked limitation in ability to respond to supervision, which Justice opined would preclude the plaintiff from performing the majority of available work. (A.R. GAN 00344). Again, other than the plaintiff's subjective complaints to Drs. Beissinger and Conrad, there is no evidence in the record that the plaintiff actually suffered any of those symptoms while working at the News Journal.

[41]  Justice's opinion that the plaintiff was not able to perform any job for which she was reasonably qualified is inconsistent with the opinions of both Dr. Beissinger and Dr. Conrad, as well as that of Dr. Shipko.

00176).  Dr. Burstein noted that the subjects the plaintiff discussed in treatment changed over time from work to family.  (A.R. GAN 00179).  Like Dr. Shipko, Dr. Burnstein also noted discrepancies in information contained in Dr. Beissinger's treatment notes and statements Dr. Beissinger provided to plaintiff's employer in support of her claim – in Dr. Beissinger's submissions to plaintiff's employer, she suggested more severe symptoms than are reflected in her treatment notes.  Dr. Beissinger also offered no examination findings to support her opinion that returning to work would exacerbate the plaintiff's symptoms. (A.R. GAN 00176).  Dr. Burstein observed that Dr. Conrad's notes are similarly lacking in examples of behavior and/or measurements of the plaintiff's cognitive functioning to support the presence of impairments.  (A.R. GAN 00176).  As Dr. Burnstein noted, the paragraphs in Dr. Conrad's notes devoted to issues discussed in treatment contain brief references to the plaintiff's subjective complaints and focus on plaintiff's life events; the notes do not contain examination findings supporting that the plaintiff's change in mood resulted in impairments in her ability to function or exacerbated her symptoms. (A.R. GAN 00176).  Both treating physicians, according to Dr. Burnstein, also failed in their sworn statements to substantiate their claims that the plaintiff was unable to return to work as a journalist.  (A.R. GAN 00173).

Dr. Burnstein opined that Justice likewise failed to provide examples of behavior or cognitive functioning measurements indicating an inability to return to work and focused instead on the plaintiff's subjective reports and the opinions of Dr. Conrad and Dr. Beissinger.  (A.R. GAN 00176).  Dr. Burnstein found the plaintiff's videotaped sworn statement significant in that it demonstrates her functional capacity and, in particular, that she does not display any signs of emotional dyscontrol or cognitive or behavioral impairment.  (A.R. GAN 00176).  According to Dr. Burnstein, the plaintiff's affect may have been slightly blunted when she gave her sworn statement, which could have resulted from a change in the plaintiff's functioning or the circumstances, but the plaintiff did not appear to be in any way impaired from a psychological perspective and did not demonstrate signs consistent with her subjective complaints.  (A.R. GAN 00176).  Although it had little bearing on his opinion, Dr. Burnstein discerned a disconnect between the plaintiff's behavior and

diagnosis. (A.R. GAN 00176). Dr. Burnstein noted that, while the plaintiff claims to suffer from PTSD as a result of the 1973 tornado, which allegedly was exacerbated by her reporting of similar natural disasters, she was relatively calm and, at times, almost smiling when discussing the event in her sworn statement. (A.R. GAN 00176). In Dr. Burnstein's opinion, the plaintiff's demeanor was more akin to someone telling an exciting story from her past than to an individual traumatized by an event; typically, someone traumatized by such an event would show more signs of emotion, such as anxiety and crying, when discussing it.[42] (A.R. GAN 00176). Dr. Burnstein opined that the plaintiff's lack of emotion suggested either that her PTSD symptoms had remitted or that she had been incorrectly diagnosed. (A.R. GAN 00176). In any event, Dr. Burnstein found no behaviors suggesting, much less confirming, the plaintiff's reports of incapacity and concluded that the information submitted by the plaintiff failed to support a functional impairment during the pertinent period and was inconsistent with both the claimant's subjective complaints and her providers' opinions regarding her ability to function.[43] (A.R. GAN 00176-77).

### C. Aetna's Denial of Plaintiff's Second Appeal

Aetna upheld its decision to deny the plaintiff's claim. After reviewing all of the information submitted by the plaintiff, Aetna concluded once again that there was insufficient medical evidence supporting the plaintiff's alleged inability to perform the material and substantial duties of her occupation during the pertinent period. (A.R. GAN 00055-57). On January 28, 2008, Aetna wrote to plaintiff's counsel informing her of its decision and setting forth the bases thereof. (A.R. GAN 00055-57). This lawsuit ensued.

---

[42] The court similarly noted a discrepancy between the plaintiff's subjective complaints, incorporated in Dr. Beissinger's and Dr. Conrad's notes and statements, and her sworn statement, including both her demeanor and her remarks, most of which were in response to the leading questions of her attorney.

[43] In Dr. Burnstein's opinion, to substantiate their conclusion that the plaintiff was functionally impaired during the pertinent time frame, Dr. Beissinger and Dr. Conrad should have submitted examination findings documenting the presence of the alleged impairments, such as examples of behavioral observations, the results of a formal mental status examination, or performance-based tests reflecting the plaintiff's cognitive functioning, which they failed to do. (A.R. GAN 00177).

**CONCLUSIONS OF LAW**

The parties agree that the plaintiff's claim is governed by ERISA. Although ERISA does not specify the appropriate standard of review,[44] the United States Supreme Court has adopted three standards for reviewing a plan administrator's decision denying a claim for disability benefits: (1) *de novo* when the plan does not grant the administrator discretion; (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) when a plan administrator has discretion, but also has a conflict of interest, arbitrary and capricious taking into account the conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008).[45] Regardless of the standard used, the standard is to be applied equally to a plan administrator's factual determinations and plan interpretations. *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1285 (11th Cir. 2003); *Torres v. Pittson Co.*, 346 F.3d 1324, 1330 (11th Cir. 2003); *Featherston v. Metro. Life Ins. Co.*, 223 F.R.D. 647, 653 (N.D. Fla. 2004). Expanding upon the standards of review set forth by the Supreme Court, the Eleventh Circuit has established a six-step process to be used in reviewing an administrator's benefits decision. *See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010). First, the court must conduct a *de novo* review of the record to determine whether it agrees or disagrees with the administrator's decision. *Id.* at 1195. If the court agrees with the administrator's decision, it ends its inquiry and affirms the decision; if the court disagrees with the administrator's decision, it must determine whether the administrator was vested with discretion in reviewing claims. *Id.* If the

---

[44] When reviewing a plan administrator's denial of a claim for benefits on a motion for summary judgment, the typical summary judgment standard does not apply. *See, e.g., Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006). In such case, "a motion for summary judgment is merely the conduit to bring the legal question before the district court. . . ."

[45] Prior to the Supreme Court's decision in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008), in the event of a conflict of interest, the district court was to apply a heightened arbitrary and capricious standard of review. In *Glenn*, however, the Court clarified that, rather than apply a heightened arbitrary and capricious standard of review, district courts should apply an arbitrary and capricious standard of review taking the conflict into account. *See Echols v. Bellsouth Telecomm., Inc.*, 2010 WL 2675911, at *1 (11th Cir. July 7, 2010) (observing that, after *Glenn*, "in reviewing an administrator's decision, the weight accorded to a conflict of interest will be informed by its 'inherent or case-specific importance'"); *see also Herman v. Metro. Life Ins. Co.*, 689 F. Supp. 2d 1316, 1324-25 (M.D. Fla. 2010).

administrator was not vested with discretion in reviewing claims, the court ends its inquiry and reverses the administrator's decision; if the administrator was vested with discretion, the court must determine, under an arbitrary and capricious standard of review,[46] whether the decision was nonetheless reasonable based on the facts known to the administrator at the time the decision was made.[47] *Id.* A reasonable decision must be upheld even if there is evidence that would support a contrary decision. *See Herman*, 689 F. Supp. 2d at 1324.[48] In other words, "[i]f the 'evidence is close,' the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision." *Williams v. Hartford Life and Acc. Ins. Co.*, 2010 WL 557265, at *2 (M.D. Fla. Feb. 12, 2010) (slip op.) (quoting *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1356 (11th Cir. 2008)). If no reasonable ground exists for the administrator's decision, the court ends its inquiry and reverses the administrator's decision; if reasonable grounds exist, on the other hand, the court must determine whether the administrator operated under a conflict of interest. *Capone*, 592 F.3d at 1195. *Id.* If the administrator did not operate under a conflict of interest, the court ends its inquiry and affirms the decision; if the administrator operated under a conflict of interest, the court must determine whether the administrator's decision was arbitrary and capricious taking the conflict of interest into account. *Id.* In this case, the plaintiff has not asserted that Aetna operated under a conflict of interest in deciding her claim; rather, the parties agree that the arbitrary and capricious standard of review applies based on the discretion afforded the administrator under the

---

[46] The Eleventh Circuit has equated the arbitrary and capricious standard of review with the abuse of discretion standard. *See Capone*, 592 F.3d at 1198 fn.8.

[47] An administrator's decision is "wrong" when, after reviewing the record *de novo*, the court disagrees with it. *Id.* In making this determination, the court is to give no deference to the administrator's decision, *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), and is to consider only the evidence in the administrative record and the plan documents available to the administrator at the time the decision was made. *Fick v. Metro. Life Ins. Co.*, 347 F. Supp. 2d 1271, 1280 (S.D. Fla. 2004) (citing *Parness v. Metro. Life Ins. Co.*, 291 F. Supp. 2d 1347, 1356-57 (S.D. Fla. 2003)).

[48] A finding that the administrator's decision was reasonable requires only that there be "a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Featherston*, 223 F.R.D. at 653 (quoting *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989) (internal quotation marks omitted)).

Plan.[49]  The court need not consider the reasonableness of the administrator's decision based on the arbitrary and capricious standard of review, however, because having reviewed the administrative record *de novo*, the court finds Aetna's decision correct and affirms it.[50]

The plaintiff has the burden of establishing her eligibility for benefits.  *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1047 (11th Cir. 1998) (*per curiam*).  To be eligible for benefits under the Plan, the plaintiff must first show that she has a medically determinable sickness.  (A.R. GAN 00003).  She must then demonstrate that, solely because of this sickness, she is unable to perform the material and substantial duties of her occupation.  (A.R. GAN 00003).  The parties do not dispute that the plaintiff has a medically determinable sickness; they do, however, dispute whether that sickness rendered the plaintiff unable to perform the material and substantial duties of her occupation during the pertinent period.  In determining whether Aetna's decision was correct, the court may consider only the facts known to Aetna at the time the decision was made, which are contained in the Administrative Record.  *See Fick*, 347 F. Supp. 2d at 1280.  In order to receive LTD benefits, the plaintiff had to be continuously disabled from

[49]  Under the Plan, the administrator has "full discretionary authority to interpret the Plan and to determine all questions relating to benefits offered under the Plan, including but not limited to eligibility for benefits."  (A.R. GAN 00008-9).

[50]  Even if the court disagreed with Aetna's decision, the result would not change because there was a reasonable basis for the decision based on the facts available to the administrator at the time the decision was made.  *See Williams*, 2010 WL 557265, at *12 (noting that "an ERISA Plan Administrator is entitled to rely on the opinion of a qualified consultant who neither treats nor examines the claimant"); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) (holding that there is no requirement that an administrator "accord special deference to the opinions of treating physicians"); *Stanley v. Astrue*, 2010 WL 2780918, at *1 (11th Cir. July 15, 2010) (unpublished opinion) (holding that substantial evidence supported decision to discount treating physician's opinion that plaintiff was physically disabled because it was inconsistent with his medical notes, the opinions of other doctors who examined plaintiff, and plaintiff's testimony); *see also Couch v. Astrue*, 267 Fed. Appx. 853, 855 (11th Cir. 2008) (finding good cause for ALJ to discredit treating physician's finding of total disability because treating physician's "notes did not suggest or impose any restrictions on her activities, or otherwise indicate that [the plaintiff] was precluded from working on account of her mental impairment," other medical sources confirmed that plaintiff's mental impairment did not substantially limit her ability to work, and plaintiff's daily activities, such as shopping, cooking, driving, cleaning, and visiting friends, were inconsistent with such a finding); and *Hensley v. Inter'l Bus. Mach. Corp.*, 123 Fed. Appx. 534, 539 (4th Cir. 2004) (unpublished opinion) (holding that it was reasonable, in light of contradictory evidence, for administrator to discount treating physician's conclusions, which appeared to be based on plaintiff's subjective complaints).

performing the material and substantial duties of her occupation from September 7, 2005, through March 8, 2006.[51]  While the plaintiff claims to have suffered from PTSD and depression for decades before becoming disabled, she attributes her alleged disability to Hurricanes Ivan and Katrina, which she claims aggravated her symptoms rendering her unable to perform the material and substantial duties of her occupation.  Although Dr. Beissinger, Dr. Conrad, and Justice cited a number of symptoms from which the plaintiff *might suffer* if she returned to work, including impaired concentration, anxiety, panic attacks, and flashbacks, not one of them cited to a single instance in which the plaintiff *actually experienced* any of those symptoms at work, much less an instance in which the symptoms prevented the plaintiff from performing her job.[52]  Indeed, there is nothing in the record suggesting that the plaintiff ever had any difficulty performing the material and substantial duties of her occupation; to the contrary, by her own account, the plaintiff was at all times a very capable and accomplished reporter, having received a merit increase each year she worked at the News Journal and a good final job review.  (A.R. GAN 00099-101).  Moreover, when Dr. Beissinger and Dr. Conrad opined that the plaintiff was disabled, they spoke mainly in terms of the plaintiff being unable to perform her job well, rather than being unable to perform the material and substantial duties of her occupation, as required under the Plan.  It was only in their sworn statements that Dr. Beissinger and Dr. Conrad opined that the plaintiff was unable to return to work and, even then, they were equivocal and based their opinions largely on the assumption that the plaintiff would be required to

---

[51]  Although the pertinent period was from September 7, 2005, to March 8, 2006, the plaintiff submitted medical records from well beyond that date.  Curiously, despite the fact that she had been seeing Dr. Beissinger and Dr. Conrad for years prior to her alleged disability, she submitted no medical records of treatment prior to her alleged disability or even during the time she allegedly became disabled and took a leave of absence from her job.

[52]  In her motion for summary judgment, the plaintiff acknowledges that the alleged functional limitations caused by her PTSD and depression "are not consistently reported in the office notes of her physicians" and suggests that the diagnoses alone sufficiently demonstrate her alleged inability to perform the material and substantial duties of her occupation. (*See* doc. 53 at 17).  The court does not agree.

report tragic and emotionally charged events, which was not a requirement of her job.[53] In addition, although Dr. Conrad stated that the plaintiff was unable to perform her job during the pertinent period, he acknowledged that he never encouraged the plaintiff to take leave from her job; rather, both Dr. Conrad and Dr. Beissinger encouraged the plaintiff to return to work in some capacity.  Even more tellingly, in contrast to her sworn statement, Dr. Beissinger stated in two Updates provided *during the twenty-six week elimination period* that the plaintiff was not totally disabled from performing the duties of her job.[54]  It was not until February 28, 2006, less than two weeks before the expiration of the elimination period and after the plaintiff reported impaired concentration, that Dr. Beissinger concluded that the plaintiff was disabled from performing the duties of her job. Not only is there a lack of credible evidence demonstrating the plaintiff's claimed inability to perform the material and substantial duties of her occupation, but there also is evidence in the record, including in the notes and sworn statements of Dr. Beissinger and Dr. Conrad, that the plaintiff was dissatisfied with her job, feared losing it as a result of a change in management, and intended to make a change in her life that encompassed a new career.[55]

Even if the plaintiff were unable to perform her job as a reporter for the News Journal, the record does not support that she is unable to perform the material and substantial duties of a reporter in general.  The term "occupation" is not defined under the Plan.  The plaintiff suggests that her occupation, for purposes of determining whether she is disabled, is a reporter *for the News Journal*.  The court disagrees.  Because the term

---

[53]  Nowhere in the plaintiff's job description does it require her to report on natural disasters or other tragic stories.  To the contrary, the plaintiff covered local government for years, including at the time she took a leave of absence from her job.  The plaintiff explained in her sworn statement that the News Journal is a small paper and that whenever a major story broke, whoever was sitting around in the newsroom would cover the story.  There is no other indication in the record, however, that the plaintiff was required to cover such stories.

[54]  The court would note that Dr. Beissinger saw the plaintiff much more frequently than Dr. Conrad, who saw her only twenty-one times over a four-year period.  (A.R. GAN 00307, 00314).

[55]  Dr. Conrad explained in his sworn statement that the plaintiff worried that she might not be able to "match up to that new management style."  (A.R. GAN 00311).

"occupation" is not defined under the Plan, the court considers the plaintiff's occupation "'as it is generally performed in the labor market.'" *Murray v. Hartford Life & Acc. Ins. Co.*, 623 F. Supp. 2d 1341, 1350 (M.D. Fla. 2009) (quoting *Clark v. Hartford Life and Acc. Ins Co.*, 2006 WL 890660, at *4 (M.D. Fla. Apr. 6, 2006)). To determine the manner in which the plaintiff's occupation is generally performed, the court looks to the definition of the plaintiff's occupation provided by the Department of Labor in its Dictionary of Occupational Titles ("DOT").[56] *See id.*; *see also Cook v. Standard Ins. Co.*, 2010 WL 807443, at *9 (M.D. Fla. March 4, 2010); *Richards v. Hartford Life and Accident. Ins. Co.*, 356 F. Supp. 2d 1278, 1287 (S.D. Fla. 2004), *aff'd*, 153 Fed. Appx. 694 (11th Cir. 2005) (finding that "[w]hen the term "occupation" is undefined, courts properly defer to the [DOT's] definition of the term because insurers issuing disability policies 'cannot be expected to anticipate every assignment an employer might place upon a employee outside the usual requirements of his or her occupation'"). Although it is not clear whether the plaintiff's position with the News Journal would fall under the DOT's definition of reporter, columnist/commentator, or editorial writer, the DOT defines all three positions and none of the definitions include reporting tragic or even emotionally charged events.[57] When asked about his

---

[56] The DOT is available at http://www.oalj.dol.gov/libdot.htm.

[57] Under the DOT's definition, a reporter "[c]ollects and analyzes information about newsworthy events to write news stories for publication or broadcast: Receives assignment or evaluates news leads and news tips to develop story idea. Gathers and verifies factual information regarding story through interview, observation, and research. Organizes material, determines slant or emphasis, and writes story according to prescribed editorial style and format standards. May monitor police and fire department radio communications to obtain story leads. May take photographs or shoot video to illustrate stories. May edit, or assist in editing, videos for broadcast. May appear on television program when conducting taped or filmed interviews or narration. May give live reports from site of event or mobile broadcast unit. May transmit information to NEWSWRITER (print. & pub.; radio-tv broad.) 131.262-014 for story writing. May specialize in one type of reporting, such as sports, fires, accidents, political affairs, court trials, or police activities. May be assigned to outlying areas or foreign countries and be designated Correspondent (print. & pub.; radio-tv broad.) or Foreign Correspondent (print. & pub.; radio-tv broad.)." A columnist/commentator "[a]nalyzes news and writes columns or commentary, based [on] personal knowledge and experience with subject matter, for publication or broadcast: Gathers information and develops subject perspective through research, interview, experience, and attendance at functions, such as political conventions, news meetings, sports events, and social activities. Analyzes and interprets information to formulate and outline story idea. Selects material most pertinent to presentation, organizes material into acceptable media form and format, and writes column or commentary. Records commentary or presents commentary live when working in broadcast medium. May be required to develop material to fit media time or space requirements. May analyze current news items and be designated News Analyst (radio-tv broad.). May be designated according to medium worked in as Columnist (print. &

understanding of the duties of a newspaper reporter, Dr. Conrad responded in his sworn statement that he was aware only of the work the plaintiff performed, which often consisted of "being in situations where there's strong emotional content, people are upset, crying, scared," such as natural disasters, accidents, and other "tense situations." (A.R. GAN 00309). In her sworn statement, Dr. Beissinger explained that the plaintiff would not be adequate in a role in which she was required to report on tragic events and environmental dangers, but stated that the plaintiff "could work doing writing tasks in another arena" – just not in a "reporting role." (A.R. GAN 00321). In addition to the nature of the plaintiff's work at the News Journal, Dr. Conrad based his opinion that the plaintiff could not return to work as a reporter on the environment at the News Journal, including the plaintiff's supervisors and the perceived "change in the political climate," which he opined made it "extremely difficult" for the plaintiff due to the uncertainty it created. (A.R. GAN 00310). In short, although there is evidence from which one could conclude that the plaintiff's overall well-being might improve if she left her job at the News Journal, there is no evidence that the plaintiff was unable to perform the material and substantial duties of her occupation from September 7, 2005, to March 8, 2006. The evidence supports Dr. Shipko's conclusion that, in stating after-the-fact that the plaintiff was unable to work as a newspaper reporter during the pertinent period, Dr. Beissinger and Dr. Conrad were taking a preventative approach based on the plaintiff's subjective complaints regarding her position at the News Journal rather than responding to documented instances of the plaintiff's inability to perform the material and substantial duties of her occupation. Based on its *de novo* review of the record, the court therefore finds Aetna's decision denying the plaintiff benefits under

---

pub.); Commentator (radio-tv broad.). May specialize in particular field, such as sports, fashion, society, or politics. May analyze topics chosen by publication or broadcast facility editorial board. May enter information into computer to prepare commentaries." Finally, an editorial writer "[w]rites comments on topics of reader interest to stimulate or mold public opinion, in accordance with viewpoints and policies of publication: Prepares assigned or unassigned articles from knowledge of topic and editorial position of publication, supplemented by additional study and research. Submits and discusses copy with editor for approval. May specialize in one or more fields, such as international affairs, fiscal matters, or national or local politics. May participate in conferences of editorial policy committee to recommend topics and position to be taken by publication on specific public issues."

the Plan correct and affirms it.  *See Richards*, 356 F. Supp. 2d at 1287 (noting that "[a] person may not be able to perform a specific job assignment, but still be able to perform the duties generally understood to be part of his or her occupation") (internal quotations omitted).

**CONCLUSION**

Accordingly, it is hereby ORDERED that defendant's motion for summary judgment is **GRANTED** and that plaintiff's motion for summary judgment is **DENIED**.  The Clerk of Court is directed to enter final summary judgment in favor of the defendant, consistent with this order, and tax costs against the plaintiff.

**DONE AND ORDERED** this 24th day of September, 2010.


s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

Case No.: 3:08cv113/MCR/MD